**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**LLOYD EDWARD FLANAGAN,**

      **Plaintiff,**

-vs-                                           **Case No. 6:10-cv-1599-Orl-DAB**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**
_____

# Memorandum Opinion & Order

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying his claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **REVERSED** and **REMANDED**.

## I.    BACKGROUND[1]

### A.    Procedural History

Plaintiff filed for a period of disability, DIB and SSI benefits on January 6, 2003, alleging an onset of disability on January 6, 2003, due to a car accident on August 8, 2002. R. 1242-44, 463-66.

---

[1]Much of the Background is adopted from the Court's prior Order in *Flanagan v. Comm. of Social Security*, Case No. 6:07-cv-301-DAB.

His application was denied initially and upon reconsideration. R. 26, 28-31, 467-71. Plaintiff requested a hearing, which was held on April 19, 2006, before an Administrative Law Judge. R. 477-518. On May 8, 2006, Plaintiff was found not disabled as defined under the Act through the date of his decision. R. 10-19. Following denial of his Request for Review of the decision by the Appeals Council on October 10, 2006,[2] Plaintiff filed this action for judicial review and, in a Memorandum Decision and Order dated March 18, 2008, the Court reversed and remanded the case for the Administrative Law Judge to reassess Plaintiff's maximum residual functional capacity after updating the medical reports from Plaintiff's neurologist and other treating physicians, obtaining an updated consultative examination to assess Plaintiff's memory problems, and a new hearing to take testimony from Plaintiff and his witnesses. *See Flanagan v. Commissioner of Social Security*, Case No. 6:07-cv-301-DAB. R. 698-713.

While the original appeal was making it was through the process, Plaintiff "e-filed" a second application on December 11, 2006. R. 599. The Commissioner ordered the remanded case and Plaintiff's new application consolidated, and a new hearing was held on April 22, 2009, before a different Administrative Law Judge, Stephen C. Calvarese (hereinafter referred to as "ALJ"). R. 1108-74. On June 30, 2009, the ALJ found Plaintiff not disabled as defined under the Act through the date of his decision. R. 599-619. Plaintiff timely filed a request for review of the ALJ's decision, which the Appeals Council denied on August 31, 2010. R. 519-21. Plaintiff filed his request for judicial review in this Court on October 29, 2010. Doc. 1.

### B. Medical History and Findings Summary

Plaintiff's medical history is set forth in detail in the ALJ's decision. By way of summary, Plaintiff complained of neck, back, and head injuries from a motor vehicle accident, and subsequent depressive symptoms. R. 80, 486-88. Plaintiff was forty-two years old at the time of the first ALJ's

---

[2]However, Plaintiff never received a copy of that decision, and on February 9, 2007, the Appeals Council granted an extension of 60 days to file an appeal. R. 6.

-2-

decision. R. 10-19, 42, 464, 496. Plaintiff has a high school education and previously worked as a truck driver; he last worked the day of the car accident. R. 81, 86, 89-90, 480-84, 507.

The second ALJ, after reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from obesity, degenerative disc disease, status-post cervical fusion, headaches, status-post head trauma, and depressive disorder, which constituted severe medically determinable impairments, but not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 602. The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform light work, as he could lift twenty pounds occasionally and ten pounds frequently, with other postural limitations; he has a moderate limitation in his ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended period, complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. R. 605. He was capable of carrying out simple tasks and making simple work-related decisions and maintaining a work routine without special supervision although he may experience occasional difficulty with attention and concentration. R. 605.

Based upon Plaintiff's RFC, the ALJ determined that he could not perform past relevant work. R. 617. Considering Plaintiff's vocational profile and RFC, the ALJ used vocational expert (VE) testimony and Rule 202.21 of the Medical-Vocational Guidelines as a framework to conclude that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. R. 618. Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision. R. 619.

Plaintiff asserts again the same single point of error as allege in the first appeal – the ALJ erred by finding he had the RFC to perform light work contrary to the various medical opinions in the case,

including the statements regarding Plaintiff's memory limitations. Because the Court finds that the ALJ's decision concerning Plaintiff's head injuries and memory problems was (again) not based on substantial evidence, the Commissioner is **REVERSED** and **REMANDED**.

## II. STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, he is not disabled. 29 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments

-4-

which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

*Background Medical History[3]*

Plaintiff was injured in a motor vehicle accident on August 8, 2002 when he stopped to make a turn in his personal truck and was hit from behind by a vehicle going about 55 miles per hour. R. 144. He hit his head on the back windshield of the truck and was knocked out for perhaps a few seconds. R. 237. He had a headache, and noticed neck and back pain, tingling in this arms, loosening of the left posterior inferior teeth, pain in his jaw, and trouble swallowing. R. 237. He was initially seen at Florida Hospital where x-rays were negative; he was given Flexeril and Anaprox. R. 143, 149. Because his daily headaches, neck and back pain, and jaw problems continued, he was seen by neurologist Frank S. Alvarez, Jr. on August 22, 2002 R. 237. The prescribed hydrocodone and diazepan made him feel too "loopy" or "drugged." R. 238. Dr. Alvarez diagnosed concussion with post concussive symptomatology of dizziness, cervicothoracic strain, post traumatic headaches, lumbosacral strain, and temporomandibular joint dysfunction; he ordered spine x-rays, physical therapy, message therapy, and referral to a dentist for the temporomadibular joint ("TMJ") diagnosis[4]. R. 239.

---

[3] Much of the Background Medical History is adopted from the Court's prior Order in *Flanagan v. Comm. of Social Security*, Case No. 6:07-cv-301-DAB.

[4] Plaintiff saw an oral surgeon on September 17, 2002 for TMJ, and the oral surgeon suggested a night splint. R. 157.

-5-

Plaintiff was limited to light duty not lifting over 15 pounds, with no excessive bending, twisting, turning, pushing, pulling or standing. At his August 29, 2002 appointment, Plaintiff complained of left shoulder pain, and he was diagnosed with left shoulder AC separation/sprain and referred to an orthopaedist. R. 235. On September 5, 2002, Plaintiff complained to Dr. Alavarez of his left arm pulling to his chest, the left side of his face shaking, twisting, and going into spasms, and Dr. Alvarez noted that those symptoms required an evaluation for seizures. R. 233. When Plaintiff returned to Dr. Alvarez on September 26, 2002, he learned that the results of his EEG were abnormal and appeared potentially epileptiform. R. 151, 231. The diagnosis was Plaintiff's post-traumatic headache symptoms were persisting. R. 232. Dr. Alvarez opined that the abnormal EEG was a normal variant because the symptoms had subsided. R. 232. Dr. Alvarez referred Plaintiff to a surgeon for further cervical evaluation based on the results of MRI of the cervical and thoracic spine[5]. R. 232.

On October 28, 2002, Plaintiff returned to Dr. Alvarez for lower back pain with numbness in the bottom of his feet, neck pain and daily headaches, memory problems, concentration problems, and speech problems expressing himself – he explained he was substituting words and sometimes his speech was nonsensical. R. 228. Dr. Alvarez opined the problems were post concussive symptoms with speech, articulation, concentration and memory. R. 228. Dr. Alvarez indicated he could refer Plaintiff to a neuropsychologist to evaluate the memory problems, but Dr. Alvarez felt that those things would resolve on their own in time; he also suggested anti-depressants to help with concentration problems. R. 229. After one month, Plaintiff's concussion symptoms had not resolved.

---

[5]The MRI of the cervical spine revealed cervical levoscoliosis, reversal of the cervical lordosis, C2-3 osteophyte narrowing the left neural foramen, C3-4 disc bulge with spondylosis indenting the thecal sac with deformity of the anterior cord margin and narrowing the bilateral neural foramina, C4-5 loss of disc height and hydration with focal posterior central herniation nucleus pulposus indenting the anterior thecal sac, C5-6 loss of disc height and hydration with focal posterior central herniated nucleus pulposus indenting the anterior thecal sac, C6-7 loss of disc height indenting the thecal sac, C7-T1 osteophyte narrowing the right neural foramen. R. 232, 243-245. Thoracic MRI revealed a probable calcification in the central portion of the intervertebral discs. The diagnosis at that time was cervical strain symptoms persist with abnormal cervical MRI and thoracic strain symptoms persisting. R. 232. Following cervical spine fusion surgery, Plaintiff's condition was stable as of October 2003. R. 375, 358-361A.

On December 1, 2002, when Plaintiff returned to Dr. Alvarez complaining of daily headaches, neck pain, low back pain, jaw pain, difficulty with memory and recall, and losing track in conversations, Dr. Alvarez suggested referral to a neuropsychologist and speech therapist for Plaintiff's post concussive-type symptomatology. R. 226. On February 6, 2003, Plaintiff underwent a speech-language pathology evaluation. R. 325. The stated reason for the referral was to "improve memory, patient is now unable to complete ADL's [activities of daily living] successfully without modification (mother writes pt's checks, etc.)." R. 325. Plaintiff was given portions of the Ross Information Processing Assessment and diagnosed with "moderate to severe cognitive linguistic deficits." R. 325. His prognosis was good with modifications. He then attended weekly speech and memory therapy sessions from February 6, 2003 to May 8, 2003. R. 316-28. On his last day of therapy on May 8, 2003, Plaintiff had achieved the maximum benefits for organizational skills, but "memory issues continue but [unreadable] given initial insult [sic], will be a factor in everyday life." R. 316.

On April 24, 2003, Plaintiff saw psychologist Dr. Bruce G. Borkosky for a consultative examination. R. 288. Dr. Borkosky noted Plaintiff's complaints of memory problems, trouble saying the right word, and trouble staying on track. R. 288. Dr. Borkosky noted Plaintiff "had subtle symptoms of a post concussive syndrome, such as a somewhat concrete understanding of questions, mis-understanding questions, losing track of the conversation, etc." R. 289. On Mental Status exam, Plaintiff could follow simple commands, math skills were fair, abstract thinking was fair, concentration and persistence were good, and he could recall two out of three words after five minutes. R. 289. He assessed Plaintiff's intellectual level as borderline and opined Plaintiff's immediate and long term memory were normal (R. 289-90) despite Plaintiff's abysmal, "extremely low" scores on the Wechsler Memory Scale-III ("WMS"). R. 290.

On the section of the WMS test measuring working memory, which measures one's ability to hold information temporarily in memory for the purpose of using that information to perform a specific task, Plaintiff scored in the borderline range on that test, exceeding only 3% of the individuals in his age group. R. 290. On the section of the WMS measuring ability to learn and remember new material, Plaintiff scored in the "extremely low" range in immediate memory and in the general memory index, exceeding only 1% of the individuals in his age group. R. 290. On auditory learning he scored in the "extremely low" range after one presentation and borderline range for multiple trials[6]. R. 291. Plaintiff also scored in the "extremely low" range in retention of information. R. 291. Despite "extremely low" range scores (worse than all but 1% of individuals in his age group) in seven of the eight categories tested by Dr. Borkosky on the Wechsler Memory Scale-III, and a "borderline" score (worse than all but 3% of individuals in his age group) in the eighth category (*see* R. 293 summary), Dr. Borkosky opined that Plaintiff had a "good" ability to understand, remember and carry out instructions, and a "fair" ability to respond appropriately to supervision, coworkers and pressures. R. 292. Dr. Borkosky diagnosed an adjustment disorder and a cognitive disorder not otherwise specified, and indicated a rule out diagnosis of Borderline Intellectual Functioning. R. 292. He also opined that Plaintiff was capable of managing his own funds. R. 292.

On its face, consulting examiner Dr. Borkosky's opinion was inconsistent based on the obvious inconsistencies in Plaintiff's WMS **"extremely low"** memory test results and Dr. Borkosky's opinion that Plaintiff had a **"good"** ability to remember and carry out instructions. The SSA recognized this and (to its credit) took the unusual step of re-contacting Dr. Borkosky to ask him to clarify the report of good memory and concentration, despite Plaintiff's extremely low memory test results. R. 296. In a three-sentence, handwritten response, Dr. Borkosky explained:

---

[6] Plaintiff's visual memory was consistent with his auditory memory, indicating modality-specific strengths and weaknesses were not apparent. R. 291.

-8-

> During the [Mental Status] examination, he was able to perform the tasks - see circled items[7]. Perhaps the difference is that the WMS focuses on different tasks, *i.e.,* new learning of "unimportant" info. or perhaps he under performed on the WMS. There were subtle signs of TBI [traumatic brain injury] as noted. ADL's - consistent with subtle signs, as noted.

R. 296. On January 4, 2004, Plaintiff was re-evaluated by Dr. Borkosky in an interview style examination, without the WMS-III being re-administered. R. 392. Dr. Borkosky opined that Plaintiff had "subtle symptoms of a post concussive syndrome, such as a somewhat concrete understanding of questions, mis-understanding questions, losing tack of the conversation, etc." R. 392. He again opined that, based on his examination, Plaintiff "had a good ability to understand, [and] a good ability to remember and carry out instructions . . . . and he is capable of managing his own funds." R. 393.

Plaintiff's treating physician, Dr. Alvarez referred Plaintiff to a neurosurgeon, Dr. C. Gilbert Tweed, who saw Plaintiff on December 18, 2002. Dr. Tweed eventually performed an anterior fusion on Plaintiff, Dr. Tweed was Plaintiff's neurosurgeon who performed the surgery on Plaintiff's spine in July 2003. *See* R. 350 (admission for anterior fusion by Dr. Gilbert Tweed, M.D.). Dr. Tweed (in follow up to the spine surgery) noted Plaintiff's condition was stable as of October 2003. R. 375, 358-361A. Dr. Tweed noted that he was not handling Plaintiff's complaints of "organic symptomatology from the cerebral standpoint and [he] probably needs to be evaluated by a neurologist to assess," and Plaintiff should be referred to a separate neurologist for diagnosis and treatment. R. 363 (September 15, 2003). Plaintiff continued to complain of headaches, cognitive problems, and twitching in his left hand, arm and chest; in October of 2003, Dr. Tweed referred Plaintiff to a new neurologist, Dr. Mary Derbenwich, specifically for further treatment of the headaches. R 428-30. On October 15, 2003, Dr. Tweed noted that Plaintiff was "doing well neurologically from the standpoint of the surgery" and "the *other complaints* are being addressed by Dr. Derbenwich." R. 363.

---

[7]No "circled items" are attached to the report or in the original CE. R. 296.

Dr. Derbenwich first evaluated Plaintiff on October 3, 2003. R. 438-30. She then sent him for a series of tests including an EEG, and EMG and an MRI. R. 428. She attempted to treat his headaches with medication. R. 425. On April 12, 2006, Dr. Derbenwich opined:

> This man was first seen by me in 2003 with the diagnosis of chronic daily headaches that have been present since a motor vehicle accident in 2002 or 2003. He has a muscle contraction component to his headaches. He has had a previous cervical fusion. He has cognitive dysfunction as well as memory problems. He has a lumbosacral radiculitis or a peripheral neuropathy. I feel that his problems are chronic and will never resolve. I feel that this man should be on permanent disability.

R. 461. Dr. Derbenwich opined the headaches were predominantly muscle contraction headaches, noting the cognitive problems along with irritability, insomnia, and difficulty functioning. R. 429. She felt that Topamax or Neurontin might help his cognitive problems, and ordered an MRI and EEG. R. 428. On December 12, 2003, Dr. Derbenwich noted that the Topamax was not helpful, and Plaintiff was switched to Neurontin. R. 425.

On November 13, 2003, Dr. Derbenwich referred Plaintiff to a psychiatrist, Dr. B. Kawliche. R. 421-22. Plaintiff complained of problems with short-term memory, concentration, focusing, headaches, depression and feeling unsteady, moody, and irritable; his mother had to take over paying his bills for him, because he could not organize that task. R. 421. Dr. Kawliche diagnosed mood disorder, secondary to general medical condition, *i.e.*, brain trauma; concussion, with severe memory cognitive difficulties contributing to his problems; he assigned Plaintiff a Global Assessment of Functioning (GAF) of 48[8]. R. 422.

Dr. Kawliche treated Plaintiff from November 13, 2003 until March 24, 2004. R. 416-421. Plaintiff started on Trileptal for the headaches, irritability and cognitive problems (R. 422), and increased the dosage on February 20, 2004. R. 418. Dr. Kawliche opined on March 10, 2004 that Plaintiff was not able to return to work at that time due to his cognitive and psychological

---

[8]The GAF is a procedure for measuring overall severity of psychiatric disturbance. The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revised, Washington, D.C., 35 (2000), commonly referred to as the DSM-IV-TR. A GAF of 48 indicates serious symptoms, such as "unable to keep a job." Id., at 35.

-10-

impairments. R. 417. On March 24, 2004, Plaintiff noted no improvement on the Trileptal and thought it might have made his muscle twitches worse, so Dr. Kawliche started to wean Plaintiff off of the medication. R. 416. Dr. Kawliche also noted that Plaintiff was going to lose his insurance in May and was working on finding some other arrangement for treatment; he continued to opine that Plaintiff was not able to work and he was "going at the very least [to] need prolonged recovery and it is also possible that he may not ever recover full function to be employed." R. 416.

*RFC and the treating physicians' opinions*

Plaintiff argues that the ALJ erred by finding he could perform light work despite his treating physicians' opinions concerning his memory and concentration problems. He also argues that the ALJ should not have relied on the expert testimony of Dr. Gross, whose opinion was based on the erroneous information about which part of the head/brain Plaintiff hit in the accident which caused his impairments. The Commissioner argues that the ALJ's reliance on the opinions of Dr. Gross and Dr. Clement was based on proper analysis.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.* Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings

-11-

and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

Plaintiff essentially raises the same single point of error as allege in the first appeal – the ALJ erred by finding he had the RFC to perform light work contrary to his treating neurologists opinions that he had significant memory and concentration limitations which would preclude him from performing any work. In the Court's previous decision remanding the matter entered on March 18, 2008, the Court found that the first ALJ erred in relying on psychological evaluation by Dr. Borkosky (ignoring the obvious inconsistency the SSA had noted) that found Plaintiff's memory functioning was "adequate in the interview but low to borderline on the Wechsler memory scale" (R. 15) and the Court remanded the case ordering the ALJ to obtain a new mental consultative examination if warranted based on the expanded record.[9]

The SSA had sent Plaintiff (presumably under the second application) for a consultative examination with Rosimeri Clements, Psy.D., Licensed Psychologist, and a postdoctoral resident, Christina Hansen, Psy.D., which they performed as "a joint work product." R. 937. In actuality, the ALJ was either confused or chose to ignore that the date of the Court's remand – March 18, 2008 – was *after* the date of a September 13, 2007 CE signed off by Rosimeri Clements which, of course, preceded the Court's remand[10]. The ALJ said at the hearing that "[W]e have a district court remand . . . that was in March '08. The reason for remand is to reassess the RFC and consider Dr. Durbovich and also a mental CE to evaluate the memory situation which we've done that with [Exhibit] 41F [Dr. Clements' CE report] and meanwhile as that was going through . . . actually sometime in the middle

---

[9]The Court need not list the other issues from the first ALJ's decision, since those are not relevant or material in the second ALJ's decision.

[10]The Court assumes that the September 13, 2007 CE was not in Plaintiff's previous appeal transcript (or discussed in the appeal) because it may have been conducted as part of Plaintiff's 2006 "e-filed" application, which the SSA consolidated only *after* remand from this Court. R. 599.

-12-

of that there was a subsequent application filed December 11 of '06 which is an E file. . . . [T]hey must all be in the paper file now." R. 1110-11.

The fact that the ALJ did not recognize that the CE was conducted six months *before* the Court's remand or as part of the E-file application from December 2006, standing alone, is not erroneous[11]; however, the ALJ's reliance on the CE report with its significant inconsistencies and equivocal opinion is erroneous, and the ALJ's decision is not based on substantial evidence.

Resident Dr. Hansen and Dr. Clements evaluated Plaintiff on September 13, 2007 after reviewing his other background information, including the Wechsler Memory Scale-III administered by Dr. Borkosky. R. 935. They noted Plaintiff had limited recall of recent and remote events, suggesting some short-term and long-term memory impairments. R. 935. His ability to handle funds was considered inadequate due to memory impairment. R. 935. "He was cooperative and appeared to put forth his best effort on the tests. . . . The tests are valid." R. 936. On the Test of Memory Malingering (TOMM), which is a test sensitive to motivation and effort, Plaintiff's scores "fell considerably below expectation and raised serious concerns" about whether "he was putting forth his best effort on all other tests," which "made it difficult, if not impossible, to validly interpret his other scores." R. 936. When the Wechsler Memory Scale-III was re-administered by Drs. Clements/Hansen, Plaintiff's immediate memory was in the extremely low range, with a relative weakness in visual short term memory. R. 936. General memory was in the borderline range, and he had difficulty with long term memory with regard to visual information. R. 937. The overall "Prognosis & Recommendations for Treatment" read:

> His prognosis is guarded due to anxiety and depression. The claimant reports symptomology of depression and it has been diagnosed and is treated by his primary care physician. Therefore a diagnosis of depression, by history will be given. A diagnosis of Malingering *may be warranted* as the claimant did not appear to put forth effort on the TOMM as well as a past report from Jacob Green, M.D., Ph.D, who

---

[11]The Commissioner also misstates that the Dr. Clements' CE was performed "after remand." Doc. 15 at 9.

-13-

> reported the claimant "overtly fabricating answers" and "cheats on visual field testing." Furthermore, his scores on the WMS-III are indicative of a person who would have extreme difficulty holding a conversation or recalling information from 10 minutes ago, which was not noted during the mental status portion of this evaluation with the claimant. *However, a diagnosis of malingering cannot be made as it is required to be noted in more than one measure and therefore a personality evaluation is recommended.* This would assist in understanding underlying personality characteristics that could be attributing to his mental health problems. It is important to note that the GAF may change once the personality evaluation is complete. The current GAF reflects what he is presenting and takes into account a past mental health diagnosis/symptoms.

R. 937 (emphasis added).

The Commissioner implicitly rejects the idea that Dr. Clements' report is inconsistent, extrapolating from the inconsistent opinions in the CE report as a whole that although Dr. Clements "noted that by appearance, Plaintiff had put forth best efforts on the various tests, after reviewing the test results, Dr. Clements opined that there was concern about possible malingering by Plaintiff." R. 936-937. Even the Commissioner does not argue that Plaintiff's test results showed he *was* malingering, but argues instead that "Plaintiff *may have been malingering* on the severity of his limitations on his cognitive abilities." Doc. 15 at 9.

As Drs. Hansen/Clements state in the CE report: "A diagnosis of malingering *cannot be made* as it is required to be noted in more than one measure and therefore a personality evaluation is recommended. This would assist in understanding underlying personality characteristics that could be [con]tributing to his mental health problems." R. 937. Rather than recognizing that Dr. Clements' CE report could not give a diagnosis of malingering for Plaintiff, which could only be confirmed by a personality test as she recommended, the ALJ gave great weight to her opinion and then selectively chose only the sections from her report which raised malingering as a possibility but did not acknowledge the portions of Dr. Clements' report that recommended additional testing to determine if Plaintiff was malingering. The ALJ states:

> The undersigned has also given weight to Dr. Clements' observation of some impairment in the claimant's short-term and long-term memory upon mental status

-14-

examination as well as her finding that the claimant's scores on the WMS-III were indicative of a person who would have extreme difficulty holding a conversation or recalling information from 10 minutes ago – neither of which was observed during her evaluation of the claimant. Some weight has also been given to observations made by Dr. Clements and Dr. Green with respect to *possible* symptom magnification and malingering.

R. 616 (emphasis added). Given the psychologists' difficulty in diagnosing genuine memory problems as separate from the possibility of Plaintiff malingering, it was error for the ALJ to rely on only the portions of the opinions that found malingering to be a possibility, without ordering the personality testing that Dr. Clements recommended to determine if Plaintiff was malingering[12].

Given the inconclusive opinion on Plaintiff's memory problems and potential malingering by Drs. Hansen/Clements in their "joint work product,"[13] it was also erroneous for the ALJ to rely on the opinion of Dr. Gross, the Medical Expert who testified at the hearing, opining that Plaintiff's cognitive impairment was mild and he was moderately impaired in concentration, persistence and pace and in handling complex instructions, based in part on Dr. Clements' CE report. R. 1115-16, 1118. When the ALJ inquired to Dr. Gross, "[W]hy there's not more severe restrictions as far as concentration?" Dr. Gross responded: "[I]t's my opinion that the head injury, the concussion or the post-concussion syndrome was mild and that often runs its course over the years so anything related to memory and to concentration and so forth would probably come from his depression and his pain. He has a pain problem which is often very distracting . . . if [he] was taking some pain medication I think that might have an effect on ongoing concentration for long periods of time." R. 1119. Dr. Gross noted that the results of the WMS-III were low (R. 1121), and he did not think that they represented a valid presentation of Plaintiff's memory function because

---

[12]The Commissioner also points to opinions from Drs. Tweed and Alvarez that Plaintiff could perform "light duty," but as the Court previously pointed out at length in the prior appeal decision, these physicians were *not* treating Plaintiff for neurological deficits in concentration or memory. *See* R. 711.

[13]It is also possible that inconsistencies in the CE report are the result of having two individuals completing the interview and the testing.

-15-

> [I]f his memory was that seriously affected he . . . probably wouldn't be able to interact with [counsel] on a productive level about his case. [T]there's one evaluation in here where he drove to the evaluation himself. He wouldn't have been able to do that. So anyhow, there are some behavioral reality based behaviors. He wouldn't be able to get up in the morning and get his kids to school and keep to the schedule and so forth. He would need a lot of structure to help with that kind of stress. The other thing is that I noticed that the people who evaluated him, they had some question as to the [efficacy] of his efforts and I would also note that a concussion, first of all apparently his head injury, while I'm not minimizing the horror of it, there was only a brief loss of consciousness. All of the MRIs and the CAT scans and the EKGs and so forth show no physical damage or damage to the brain so we would classify it as a mild concussion disorder. And so concussions usually resolve or heal up on their own [inaudible] within six months to 18 months, usually ten month severity you get 90 plus percent return of function. The memory problems shown in the Wechsler Memory Scale results would not have resulted from a concussion, a mild concussion. Especially in the area of the brain at the top of the head where this occurred.

R. 1122.

When Plaintiff's counsel pointed out that Plaintiff's injury was on the back of his head – with the truck getting rear-ended, his head going forward, then slung back and hitting the glass panel behind his seat – Dr. Gross conceded that with a rear-end type accident, Plaintiff's brain would have hit the front of the inside of the skull and then the back inside of the skull, which "certainly could cause some of the memory problems, some of the difficulties that he's experiencing." R. 1123. However, Dr. Gross opined that "it would have long since been resolved." R. 1124. Although he also admitted that there are situations where the symptoms never go away, he said that typically correlated to the amount of time the person had been unconscious and the severity and longevity of the symptoms. R. 1124. After listening to Plaintiff's testimony about his memory problems at the hearing, Dr. Gross modified his original opinion:

> [T]he only thing I would like to add is that I would like to make clear that I don't have any doubt that from the time this gentleman had his accident until about a year after that he had some significant problems then. . . . Mostly memory problems . . . and depression as well. *But I think the memory problems for that period of time were certainly genuine so I'm going to reflect it in the evaluation that we talked about.*

R. 1140 (emphasis). Based on the opinion of Dr. Gross, "there was no doubt" that Plaintiff suffered from memory problems the first year following his accident. R. 1140. However, based on the

-16-

equivocal results in the malingering testing performed by Dr. Clements and the ALJ's failure to send Plaintiff for the personality testing as she recommended, the ALJ's reliance of the selective portions of Dr. Clements' CE report and the opinion of Dr. Gross based in part on the same testing was not based on substantial evidence.

## CONCLUSION

For the reasons set forth above, the ALJ's decision concerning Plaintiff's head injuries and memory problems was (again) not based on substantial evidence. Accordingly, the Court **REVERSES and REMANDS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the ALJ is **DIRECTED** to reassess Plaintiff's maximum residual functional capacity after considering, and updating as appropriate, the medical reports from any treating physicians and order an updated consultative examination (dated after March 1, 2012) to assess Plaintiff's memory (and or malingering) problems, including personality testing if recommended by the CE. Upon remand, the ALJ will schedule an additional hearing, allow Plaintiff to testify and present additional evidence, including the testimony of witnesses Plaintiff wants to present.

The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 15, 2012.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record